[No. C051124. Third Dist. Sept. 13, 2007.]

AEROJET-GENERAL CORPORATION, Plaintiff and Appellant, v. COMMERCIAL UNION INSURANCE COMPANY et al., Defendants and Respondents.

**COUNSEL**

Nossaman, Guthner, Knox & Elliott, Elaine Mary O'Neil, Carl L. Blumenstein, Deborah E. Beck; Winston and Strawn, Scott P. DeVries, Robert A. Julian, Susan E. Lee; and William Hvidsten for Plaintiff and Appellant.

Duane Morris, Ray L. Wong, Paul J. Killion, Kate Cutler; Bishop, Barry, Howe, Haney & Ryder, Foley & Mansfield, J. Scott Wood; Lynberg & Watkins and David K. Morrison for Defendants and Respondents.

**OPINION**

**NICHOLSON, J.**—This case concerns whether sums agreed to be paid as a settlement of litigation are subject to indemnification as "damages" under excess liability insurance policies. Plaintiff sued for breach of contract and declaratory relief against its excess liability insurance carriers due to their refusal to indemnify plaintiff for costs it incurred to remediate polluted real property pursuant to a settlement agreement from another legal action. The trial court granted summary judgment to the insurers, determining the insurers were not liable under the terms of their policies to indemnify plaintiff for its costs. We conclude the trial court interpreted the insurance policies correctly and affirm its judgment.

## BACKGROUND

*Undisputed facts*

We recite the trial court's concise statement of the case's undisputed facts. "Plaintiff Aerojet filed this action for breach of contract and declaratory relief against certain excess carriers seeking indemnification for the costs of remediating groundwater contamination near its former facility in Azusa.[1] The complaint alleges that in 2000 and 2001 various water entities filed law suits alleging that Aerojet was liable for CERCLA[2] response costs and other costs arising out of the alleged contamination of groundwater in the San Gabriel Valley. Aerojet gave defendants notice of each lawsuit, but no excess carrier accepted Aerojet's tender of defense or indemnity. The water entity lawsuits were all settled in March 2002 and were subsequently dismissed in September 2002.[3] The settlement agreement obligates Aerojet to pay approximately $175 million, which exceeds the total amount of its primary and excess insurance coverage for each year in the period of 1958–1970. Aerojet demanded payment pursuant to its policies; excess carriers all denied liability.

"Defendants contend they are not liable under their excess liability policies to indemnify Aeroject [*sic*] for the groundwater remediation claims because the water entities claims were settled and not adjudicated against Aerojet to an award of damages. Defendants rely on *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 960 [103 Cal.Rptr.2d 672, 16 P.3d 94], which held that an excess carrier is not liable under a policy providing for indemnity upon the insured's payment of damages unless damages have been awarded against the insured by a court."

*The insurance policies*

Central to this appeal are three clauses in the insurance contracts, typically referred to as the "insuring agreement," the "attachment of liability clause," and the "no voluntary payments clause."

---

[1] The carriers are American Home Assurance Company, American International Reinsurance Company, Inc., and The Insurance Company of the State of Pennsylvania (collectively the AIG Member Companies), and Commercial Union Insurance Company.

[2] The federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 et seq.).

[3] The lawsuits were all dismissed without prejudice. Some were dismissed voluntarily, and the others were dismissed by order of the court pursuant to a stipulation between the parties.

The insuring agreement defines the type of costs which the insurer will indemnify. In all of the contracts at issue here, the insuring agreement obligates the insurer to indemnify for "damages" and nothing else. With only slight variations that do not affect the meaning, all five of the Commercial Union contracts and the three AIG Member Companies policies required the insurer to indemnify Aerojet for "all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . ."[4]

The attachment of liability clauses state the insurers, as excess insurers, are not liable to pay until either the underlying insurers admit liability, or the insured is held liable to pay by a final judgment an amount which exceeds the underlying insurance and the underlying insurers have paid or been held liable to pay their full limits. Specifically, most of the Commercial Union clauses state: "Liability to pay under this insurance shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limits or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limits and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limits." The AIG Member Companies' attachment of liability clauses express the same conditions precedent to liability attaching.

The no voluntary payments clause requires the insurer's written consent before it will indemnify any costs. The clauses in the Commercial Union and AIG Member Companies' policies, with only slight variations, read: "In the event of claim or claims arising which appear likely to exceed the Primary and Underlying Excess Limits, no costs shall be incurred by the Assured without the written consent of the Underwriters."

---

[4] The differences in wording between the policies involve omitting the commas, omitting the phrase "shall pay," and using the words "adjudged to pay" or "liable to pay" in place of "legally obligated to pay." Thus, one Commercial Union policy requires indemnity for "all sums which the Assured shall become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons . . . as damages . . . ." Another Commercial Union policy requires the insurer "to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as ¦damages . . . ."

The insuring agreement in one of the AIG Member Companies' policies states the insurer will pay "all sums which the Assured shall become liable to pay and shall pay or by final judgment be adjudged to pay as damages . . . ." The other two AIG Member Company policies state the insurer will "pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . ."

*Procedural history*

Defendants demurred to Aerojet's complaint. The trial court (Judge Loren McMaster) overruled the demurrer. The court determined the policies' limitation to indemnify sums which Aerojet shall become liable to pay, or by final judgment be adjudged to pay, as damages was ambiguous, and could be read to require payments in cases other than those adjudicated to a final judgment. It also distinguished *Certain Underwriters at Lloyd's of London v. Superior Court, supra,* 24 Cal.4th 945 (*Powerine I*), claiming the Supreme Court in *Powerine I* did not decide the issue here of whether the term "damages" required litigating a suit to final judgment.

After discovery and on the eve of trial, each of the defendants filed separate motions for summary judgment, in which all of the other defendants joined. Collectively, the motions sought judgment based on the following grounds: (1) defendants owed no duty to indemnify Aerojet under the insuring agreement clauses because the costs paid pursuant to the settlement agreement were not "damages," as defined in *Powerine I* (this ground is referred to by the parties as the "no damages motion"); (2) no duty to indemnify was owed under the attachment of liability clauses because Aerojet could not establish the underlying insurers admitted liability, or that the underlying insurance policies were exhausted by a "final judgment" in the water entity actions, as required in the attachment of liability clauses and by an earlier unpublished decision of this court involving this issue between Aerojet, defendants, and other reinsurance companies, *Aerojet-General Corporation v. Transcontinental Insurance Company* (June 7, 2002, C036514, C037097) [nonpub. opn.] (*Transcontinental*) (the "no exhaustion motion");[5] and (3) Aerojet could not sustain its burden of proof to establish the damages attributable to each of the alleged occurrences at the San Gabriel site, as required under *Golden Eagle Refinery Co. v. Associated Internat. Ins. Co.* (2001) 85 Cal.App.4th 1300, 1316 [102 Cal.Rptr.2d 834], and *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132 [72 Cal.Rptr.2d 467] (the "failure of proof motion").

The trial court (Judge Thomas Cecil) granted summary judgment on the no damages motion and the no exhaustion motion. "Under *Powerine*," the court

---

[5] This unpublished opinion is cited pursuant to California Rules of Court, rule 8.1115(b), as relevant under the doctrine of law of the case. In *Transcontinental, supra,* C036514, we affirmed summary judgment for defendants and other excess carriers, concluding Aerojet had not established exhaustion based on "buy-back" settlement agreements with the underlying insurers. However, we also stated that we saw no reason to conclude Aerojet would never be able to show exhaustion. We held exhaustion could be established if Aerojet proved payments by primary insurers "were, in fact, in excess of the primary policy limits in the event that judgment is entered against Aerojet in the toxic tort cases." (*Transcontinental, supra,* C036514.)

Aerojet filed this action against defendants after our ruling in *Transcontinental*.

wrote, "the language in the policies at issue providing for payment of sums Aerojet becomes legally obligated to pay as damages is limited to sums Aerojet was ordered to pay by the court. The monies paid in settlement do not meet this definition."

The court also determined defendants were not equitably estopped from relying on the terms of their policies to deny Aerojet's claims.

The court dropped the failure of proof motion on the basis it was moot in view of the court's orders on the other two motions.

## DISCUSSION

Aerojet appeals from the entry of summary judgment, claiming the trial court erred by (1) interpreting the insuring agreement clause under the rule of *Powerine I*; (2) concluding that the settlement agreement did not constitute a final judgment to trigger the attachment of liability clauses, allegedly contrary to the doctrine of retraxit; and (3) not estopping defendants from denying the settlement agreement they allegedly approved by implication, despite the no voluntary payments clause. We disagree with each of Aerojet's claims.[6]

### I

### *Standard of Review*

Our Supreme Court recently set forth the standard of review and rules of interpreting insurance policies in *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377 [33 Cal.Rptr.3d 562, 118 P.3d 589] (*Powerine II*). For ease of reading, we omit citations from the passage. The court wrote: " 'When determining whether a particular policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law. . . .'

" 'The insurer is entitled to summary adjudication that no potential for indemnity exists . . . if the evidence establishes as a matter of law that there

---

[6] Aerojet argues at some length that Judge McMaster's ruling on the demurrer was the correct ruling and should be followed here. A ruling on a demurrer is an attack on the pleadings, and is not binding on subsequent summary judgment motions. (*De La Beckwith v. Superior Court* (1905) 146 Cal. 496, 499–500 [80 P. 717].) Even when the same legal issue is presented, "a motion for summary judgment or adjudication is not a reconsideration of a motion overruling a demurrer." (*Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 205 [56 Cal.Rptr.2d 732].) We thus do not address Judge McMaster's ruling.

is no coverage. . . . We apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.'

"In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts. . . .

■ " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." . . . "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." . . . "Such intent is to be inferred, if possible, solely from the written provisions of the contract." . . . "If contractual language is clear and explicit, it governs." . . .' . . .

■ " ' "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." . . . The fact that a term is not defined in the policies does not make it ambiguous. . . . Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " . . . " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " . . . "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." ' " (*Powerine II, supra,* 37 Cal.4th at pp. 390–391, citations omitted.)

## II

### Powerine I *Governs This Case*

This case follows a line of relatively recent Supreme Court opinions that interpret indemnity obligations in commercial liability insurance policies, particularly as they may apply to the insured's potential liability for environmental harm to real property. To understand the legal context in which this case arises, we first review the Supreme Court's authority on this subject. We then explain how one of these opinions, *Powerine I,* compels us to affirm the grant of summary judgment here.

The court in 1998 determined that an insurer's duty to defend the insured in a "suit seeking damages" under a standard form comprehensive general

liability insurance policy was limited to a civil action prosecuted in a court. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878–888 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*).) The case arose from an administrative order directing a property owner to clean up contaminated property. The owner's insurance policy required the insurer to pay " 'all sums which the insured shall become legally obligated to pay as damages . . . and the [insurer] shall have the right and duty to defend any suit against the insured seeking damages . . . and may make such investigation and settlement of any claim or suit as it deems expedient . . . .' " (*Id.* at p. 863.)

The court interpreted the phrase "suit seeking damages" literally, holding that the phrase limited the insurer's obligation to defend to civil actions prosecuted in a court. (*Foster-Gardner, supra*, 18 Cal.4th at pp. 869–871, 878–888.) Following from this interpretation, the court concluded that a proceeding conducted by an administrative agency pursuant to an environmental statute was not a "suit," but rather implicated a "claim." (*Id.* at pp. 878–888.) Thus, although the insurer had the authority to investigate and settle both claims and suits, it was under no obligation to defend against a claim. (*Ibid.*)

Having decided the scope of the insurer's duty to defend, the court in *Powerine I* determined the scope of the standard policy's duty to indemnify. It similarly limited the insurer's duty to indemnify to " 'damages,' i.e., money ordered by a court." (*Powerine I, supra*, 24 Cal.4th at p. 961.) This case also arose from administrative orders directing a defunct oil company to clean up contaminated sites. The policy required the insurer to " 'pay all sums that the insured becomes legally obligated to pay as damages' " for harm within coverage. (*Id.* at p. 957.)

Just as the word "suit" limited an insurer's duty to defend, the word "damages," the court reasoned, limited the insurer's duty to indemnify. The court listed a number of arguments in support of its conclusion. First, the court developed a syllogism it called "*Foster-Gardner*'s syllogism" based on its holding in *Foster-Gardner*: "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a 'suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond 'damages,' i.e., money ordered by a court, but rather is limited thereto." (*Powerine I, supra*, 24 Cal.4th at p. 961.)

Next, the court relied upon the literal meaning of the employed terms. The duty to defend can arise whenever "damages" are sought by a "suit," but the duty to indemnify can arise only when "damages" are fixed in their

amount. And damages can only be fixed in a suit through a court's order. (*Powerine I, supra*, 24 Cal.4th at pp. 961–962.)

■ Thirdly, the court looked at the broader legal context, stating that "damages" exist traditionally inside a court, while "harm" exists outside a court. An insurer can become legally obligated to pay in ways other than by an order of the court, but one is not legally obligated to pay "damages" apart from any order by a court. Thus, the word "damages" operated to limit the insurer's obligation to indemnify only to money ordered by a court. (*Powerine I, supra*, 24 Cal.4th at pp. 962–964.) Accordingly, the duty to indemnify "does not extend to any expenses required by an administrative agency pursuant to an environmental statute . . . ." (*Id.* at p. 966.)

Having established these foundational interpretations for standard general liability policies, the court next had the opportunity to apply them to excess liability policies. In two separate cases, the court relied upon *Powerine I* to interpret indemnity provisions in excess insurance policies. In one case, *Powerine II*, the court determined the excess policy's language was broader than the standard policy language interpreted in *Powerine I* and obligated the excess insurer to indemnify the insured's costs arising from an administrative cleanup order. (*Powerine II, supra*, 37 Cal.4th at pp. 395–399.)

There, the excess/umbrella policies required the insurer to indemnify " 'for *damages*, direct or consequential *and expenses, all as more fully defined by the term "ultimate net loss"* . . . .' " (*Powerine II, supra*, 37 Cal.4th at p. 395, original italics.) "Ultimate net loss" was defined as the total sum the insured became obligated to pay " '*either through adjudication or compromise, and shall also include* . . . expenses . . . for *litigation, settlement, adjustment and investigation of claims and suits* . . . .' " (*Id.* at pp. 395–396, original italics.)

The court determined the policy's use of the word "expenses" extended coverage beyond the limitation imposed by use of the word "damages" alone. It also determined that by defining expenses to include those incurred for "litigation, settlement, adjustment and investigation of claims," the indemnity coverage extended to expenses incurred in responding to administratively imposed government orders to clean up environmental pollution. (*Powerine II, supra*, 37 Cal.4th at pp. 396–398.)

By contrast, in the second case interpreting an excess insurance policy, the court held that the policy language with its limitation to "damages," similar to that in *Powerine I*, did not require the insurer to indemnify the insured for the costs of settling third party claims for environmental harm that were negotiated outside the context of a suit. (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 416–417 [33 Cal.Rptr.3d 583,

118 P.3d 607] (*County of San Diego*).) The excess policy in that case required the insurer to indemnify the insured " 'for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement,' arising from 'damages' caused by personal injuries or the destruction or loss of use of tangible property." (*Id.* at p. 411.)

Initially, the court noted that the *Foster-Gardner* syllogism developed in *Powerine I* did not apply to this excess insurance policy because, like the policies before us, this policy contained no duty to defend. (*County of San Diego, supra*, 37 Cal.4th at p. 416.) "However," the court continued, "the scope of the indemnification obligation under this policy remains governed by our holding in *Powerine I*. . . . [T]he reasoning of our decision in *Powerine I* regarding the limitation the term 'damages' imposes on the scope of indemnity coverage under the standard [comprehensive general liability] policy applies perforce to the insuring provisions of this nonstandard excess insurance policy which, like the standard [comprehensive general liability] policy considered in *Powerine I*, utilizes 'damages' as the sole term of limitation of the indemnity obligation under the insuring agreement." (*County of San Diego, supra*, at pp. 416–417.) Thus, the settlement costs agreed to with third parties outside the context of a court suit were outside the policy's indemnity coverage because they were not damages, i.e., money ordered by the court to be paid.

The case before us presents the next question to be answered in this ongoing line of opinions: whether settlement costs negotiated *within* the context of a court suit are "damages." Resting our decision as we must on the express language of defendants' excess policies and on the Supreme Court's interpretation of the term "damages," we conclude the settlement costs incurred by Aerojet are not damages, and thus are not within the policies' indemnity obligations.

All of the excess policies are written to limit the scope of indemnity coverage to all sums Aerojet is obligated to pay as damages. With slight variations, they state the insurers must pay "all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . ." Unlike the policies at issue in *Powerine II*, there is no language in these policies suggesting indemnity is owed for anything other than damages.

■ There can be no dispute that the term "damages" as interpreted in *Powerine I* and used in liability insurance indemnity provisions means only money ordered by a court to be paid. The term has a clear and literal meaning, and, having been construed consistently by the Supreme Court as money ordered by a court to be paid, the term cannot be held to be ambiguous. (*County of San Diego, supra*, 37 Cal.4th at p. 423.)

Here, the record contains no order by the court directing Aerojet to pay damages. The settlement agreement was negotiated and agreed to by Aerojet and the water entities themselves. There is no evidence they sought for the terms of the agreement to be entered as the judgments in the lawsuits. Indeed, there are no judgments entered in the record at all. Instead, there are only stipulations and orders for dismissal without prejudice, and voluntary dismissals without prejudice. Nothing in the record indicates the court ordered Aerojet to pay any sum of money. Accordingly, the settlement costs are outside the scope of indemnity coverage in defendants' policies.

Aerojet disagrees with our reliance on *Powerine I* on numerous grounds, all of which we reject. First, Aerojet argues that *Powerine I*'s definition of damages as money ordered by a court is dicta as it was not necessary for resolving that case under the *Foster-Gardner* syllogism. It also claims it was dicta because the administrative orders at issue in *Powerine I* never ripened into a lawsuit.

This argument ignores the thrust of the Supreme Court's opinion. There was no dispute that no lawsuit had been filed in that case. At issue was whether the insurance policies provided indemnity for costs incurred in response to an administrative order. The court could not answer that question without first interpreting the indemnity clauses' language and their pivotal term, "damages." The court did this as part of applying the *Foster-Gardner* syllogism as well as interpreting the policy language. (*Powerine I, supra*, 24 Cal.4th at p. 961.) The entire opinion pivoted on the definition of "damages." It was not dicta, but rather was a key holding in support of the final judgment.

Second, Aerojet incorrectly claims the phrase "money ordered by a court" refers generally to any monies paid to resolve a lawsuit as distinguished from monies paid in response to an administrative order. Aerojet cites to no authority supporting this interpretation. The clause means what it says: money *ordered* by a court.

Third, Aerojet claims our and the trial court's application of *Powerine I* to this case conflicts with two earlier Supreme Court rulings, *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*), and *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*), as well as with *Foster-Gardner*. The Supreme Court rejected this argument in *Powerine I*, noting its decision was consistent with its earlier authority.

In *AIU*, the court held that an order for injunctive relief triggered a duty to indemnify. (*AIU, supra*, 51 Cal.3d at pp. 825–826.) In *Vandenberg*, the

court determined that an award of contractual damages triggered a duty to indemnify. (*Vandenberg, supra*, 21 Cal.4th at pp. 824–825.) In *AIU* and *Vandenberg*, the court held "the duty to indemnify may embrace *all* money ordered by a court . . ." (*Powerine I, supra*, 24 Cal.4th at p. 966, original italics.) In *Foster-Gardner*, the court held the duty to defend "suits" did not apply to claims asserted by administrative agencies, although it and the duty to indemnify could apply if a claim became a suit. (*Powerine I, supra*, at p. 967.) In these three cases, the court "did *not* hold that the duty extends to any money *in addition to that ordered by a court* . . . ." (*Ibid.*, original italics.) Our application of *Powerine I* is completely consistent with these earlier precedents.

Fourth, Aerojet argues that applying the *Powerine I* definition of damages here renders certain language unique to these indemnity clauses redundant. With slight variations in the wording, the clauses required defendants to pay "all sums which the Assured shall become legally obligated to pay, *or by final judgment be adjudged to pay*, to any person or persons as damages . . . ." Aerojet claims *Powerine I* interpreted the first clause to mean damages ordered by a final judgment. Applying that interpretation here, it asserts, makes the second clause superfluous. This argument sidesteps the fact that no matter how an obligation to pay money is arrived at, the defendants under the express terms of the policies must indemnify only damages, i.e., all money ordered by a court. Here, there is no court order requiring Aerojet to pay money.

■ Moreover, the "final judgment" clause is not rendered redundant by *Powerine I*'s interpretation. Money can be expressly ordered by the court as damages in a final judgment, or, for example, as in *AIU*, as the expenses that arise from complying with an injunction. Money can also be ordered by the court outside of a final judgment by means of interim orders or awards of costs and attorney fees. Thus, both clauses have independent meaning within the context of court-ordered damages.

■ Fifth, Aerojet argues that applying *Powerine I* to this case defeats the public policy favoring settlements. Whatever merit there may be to conflicting social and economic considerations, they have nothing whatsoever to do with our interpretation of the unambiguous contractual terms. (*Foster-Gardner, supra*, 18 Cal.4th at p. 888.) If contractual language in an insurance contract is clear and unambiguous, it governs, and we do not rewrite it "for any purpose." (*Powerine I, supra*, 24 Cal.4th at pp. 967, 968.)

■ Based on the above, we conclude the trial court correctly applied *Powerine I* to this case. Because the court did not order the payment of any money, defendants had no duty under the terms of their insurance policies to

indemnify Aerojet for the costs it incurred in implementing its settlement agreement with the water entities.

## III

### *Retraxit Does Not Apply*

Under the attachment of liability clause, defendants were not liable under their excess insurance policies until either Aerojet's underlying insurers admitted liability, or Aerojet was held liable to pay by a final judgment an amount which exceeded the underlying insurance. (*Transcontinental, supra,* C036514.) Aerojet argues that even if *Powerine I* applies, the settlement agreement constituted a final judgment for purposes of the attachment of liability clause, making Aerojet's obligations under the settlement agreement "money ordered by the court." It claims this is so under the doctrine of retraxit. We disagree.

■ "In common law, a retraxit was 'a voluntary renunciation by plaintiff in open court of his suit and cause thereof, and by it plaintiff forever loses his action.' [Citations.] In California, the same effect is now accomplished by a dismissal with prejudice. [Citations.]" (*Morris v. Blank* (2001) 94 Cal.App.4th 823, 828 [114 Cal.Rptr.2d 672].) The defense of retraxit has been subsumed into the doctrines of res judicata and collateral estoppel. (*Id.* at pp. 829–832.)

The doctrine would not apply here because the water entities did not dismiss their actions with prejudice. Thus, there is no legal bar to further litigation, and the settlement agreement cannot be seen to act as a final judgment on the entities' claims. Indeed, from the trial court's perspective, because the cases were dismissed without prejudice, it is as if the cases never existed.

## IV

### *Defendants Were Not Equitably Estopped*

Lastly, Aerojet asserts the trial court erred by concluding defendants were not equitably estopped from relying on the terms of their indemnity agreements, including the no voluntary payments clause's requirement of written consent. Aerojet claims it kept defendants apprised of its settlement strategy and negotiations, and reasonably relied upon defendants to voice any concerns or objections. It asserts defendants' silence gave rise to an equitable estoppel. At a minimum, Aerojet claims, the issue of estoppel presented a

factual issue that the trial court should have allowed to go to a jury. We disagree with Aerojet's arguments.

 "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citation.]" (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].)

Here, there is no evidence suggesting defendants intended that as a result of their conduct Aerojet would settle the water entity suits and seek indemnity, nor is there evidence defendants acted in such a manner that Aerojet could have reasonably believed defendants intended such. Defendants refused to participate in any of the negotiations and never did in fact participate. Indeed, Aerojet was aware that defendants had reserved their rights to contest coverage.

Unlike the primary insurers, defendants were under no obligation to investigate the claim or defend against it. Liability attached only when the primary insurers admitted liability or a final judgment for damages was entered, two events that never happened in this case.

Moreover, Aerojet was aware of *Powerine I* before it entered into the settlement agreement. A letter written by Aerojet's attorney proposed that the settlement agreement be entered as a stipulated judgment in order to "protect claims against their insurers in light of the Powerene [*sic*] case." The trial court noted this letter indicated "Aerojet was aware of the opinion, as of course it should have been."

Aerojet asserts the issue of estoppel is one of disputed fact. However, Aerojet's conclusive declaration that it "relied on [its] insurers to raise any concerns or objections to its strategy or to its intended settlement" did not create a disputed issue of fact that defendants intended or acted in such a manner that Aerojet would settle the water entity suits believing defendants would indemnify them. The trial court correctly determined no equitable estoppel could be established as a matter of law.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to defendants. (Cal. Rules of Court, rule 8.276(a).)

Blease, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied October 12, 2007, and appellant's petition for review by the Supreme Court was denied December 19, 2007, S157487. Kennard, J., and Corrigan, J., did not particpate therein.