[No. D056377. Fourth Dist., Div. One. Feb. 28, 2011.]

CORONADO CAYS HOMEOWNERS ASSOCIATION, Plaintiff and Respondent, v.
CITY OF CORONADO, Defendant and Appellant.

604

**COUNSEL**

McDougal, Love, Eckis, Boehmer & Foley, Steven E. Boehmer, David M. Stotland and Randall R. Sjoblom for Defendant and Appellant.

Epsten Grinnell & Howell, Rian W. Jones, Vincent J. Sincek and Carrie M. Timko for Plaintiff and Respondent.

OPINION

McCONNELL, P. J.—City of Coronado (the City) appeals a judgment in which the court determined the City, rather than Coronado Cays Homeowners Association (the Association),[1] is responsible for maintaining a berm that laterally supports bulkheads located on property within the Coronado Cays subdivision. The bulkheads are adjacent to and act as a retaining wall for a waterway that belongs to the City, over which the Association has an easement. The City contends the court erred by granting the Association declaratory relief as there was no actual controversy between the parties; misinterpreting the operative documents, a special use permit and an assessor's parcel map; and not including in the judgment certain information included in the statement of decision. We find all contentions lack merit and affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

In 1967 the City sold property to Atlantic Richfield Company and Cedric Sanders (together the developer) for the development of a "marina type residential planned community . . . development" called Coronado Cays. The contract required the developer to obtain a special use permit (SUP).

Under the 1968 SUP, the developer installed concrete bulkheads along "Lot 90" of the development to act as a retainer for a 200-foot-wide waterway to be dredged on the adjacent "Lot C." The bulkheads, which are connected by tongue-and-groove construction, consist of concrete sheet piles that were "jetted" into place in native soil. Lot C was then dredged into a trapezoidal waterway, leaving a slope, called a "berm," to provide passive lateral support for the toes of the bulkheads. The tops of the bulkheads are "restrained by a tie-back" system that "goes underneath the residence[s], about 25 feet back."

Under the SUP, the developer dedicated Lot C to the City for public recreational use, reserving a 55-foot-wide easement for docks and related structures for the private use of Coronado Cays residents. The reserved area of Lot C is referred to as "Lot 90-A and 90-B."

The Association eventually succeeded to the developer's or its assignee's interest in the project. It is agreed that the Association must maintain the bulkheads and the City must maintain the waterway. In around 1985,

---

[1] The Association was originally named Coronado Cay Homeowners Association; the name was changed to Coronado Cays Homeowners Association.

however, a question arose as to whether the City or the Association is responsible for maintaining the berm in which the bulkheads are imbedded.

In 1986, a bulkhead elsewhere in Coronado Cays failed because of erosion of the supporting berm. In response, the City passed a resolution to implement a periodic inspection program and to perform required maintenance. Between 1974 and 2006, the City had surveys conducted of the condition of the berm at issue in this litigation.

In February 2008 the Association brought this declaratory relief action against the City. In March 2008 it filed a first amended complaint. The Association sought a judicial determination the City is required to maintain the berm since it is located in the waterway.

At trial, the Association cited section S.W.—109.2 of the SUP, which provides in relevant part: "The [C]ity shall accept interior waterways as fee lands for dedication and maintenance, including maintenance of the easement and right-of-way areas reserved by the developer. Maintenance shall include any redredging necessary in the future to maintain original dredged depths."[2]

The City denied any responsibility, arguing the following language from Map No. 6181 pertaining to dedications and reservations trumped section S.W.—109.2 of the SUP: "We also accept on behalf of the public all of lot C . . . , not including bulkheads, for use as public and navigable waterways . . . reserving however unto Coronado Cay Company, . . . the following severable and assignable easements and rights of way; . . . as to Lot 90-A and 90-B, easements and rights of way in, over, across, upon and through all of said Lots for the purpose of locating, constructing and maintaining, using and operating thereon, free of any rental charged by the City . . . , docks, wharfs, slips, ramps, rafts, beaches, navigational aids, piers, floats, landings, decks . . . , footings, pilings and *ancillary structures* for bulkheads and similar or related wharfage facilities." (Italics added, some

---

[2] The record indicates that in 2001 the City, at the Association's request, adopted a specific plan for Coronado Cays to supplant the SUP, with the exception of section S.W.—109.2. The City also adopted a resolution to amend S.W.—109.2 of the SUP to define the term "waterway" as a "navigable body of water from the face of the bulkhead to the face of any other bulkhead." The amended version also requires the City to maintain the waterway including "any re-dredging necessary in the future to maintain original dredged depths." At trial, the court questioned whether the City could unilaterally amend section S.W.—109.2 of the SUP, and the City conceded that the operative documents were the original section S.W.—109.2 of the SUP and the assessor's parcel map (Map No. 6181). Our holding would be the same under either the original or amended version of the provision.

capitalization omitted.) The City argued the berm falls within the definition of "ancillary structures" the Association must maintain.

Evidence was presented that the mud line of the berm had dropped at a rate of about one foot per 10 years. Material eroding from the berm reduced the slope and raised the depth of the waterway, and the City had not maintained the waterway at its originally dredged depth. The Association argued the City should redredge the waterway to its original depth "and put[] the tailings back up where they came from," meaning on the top of the sloped berm. There was also testimony that the berm is currently stable and the bulkheads are not in jeopardy of failing.

In a statement of decision, the court concluded the City is responsible for maintaining the berm. The court relied on section S.W.—109.2 of the SUP, and rejected the argument the berm is an "ancillary structure" under Map No. 6181. Judgment was entered on December 3, 2009.

## DISCUSSION

### I

### *Propriety of Declaratory Relief*

Preliminarily, we dispose of the City's contention the court erred by granting declaratory relief because the evidence showed the berm is currently stable and needs no maintenance, and thus there was no actual controversy between the parties.

Declaratory relief is available "in cases of actual controversy relating to the legal rights and duties of the respective parties." (Code Civ. Proc., § 1060.) " 'Whether a claim presents an "actual controversy" within the meaning of Code of Civil Procedure section 1060 is a question of law that we review de novo.' [Citation.] When an actual controversy does exist, Code of Civil Procedure section 1061 gives the trial court discretion to determine whether it is 'necessary' and 'proper' to exercise the power to provide declaratory relief. (Code Civ. Proc., § 1061.) A trial court's decision to exercise that power is reviewed under an abuse of discretion standard of review." (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 741 [102 Cal.Rptr.3d 759].) Doubts about the propriety of the court's decision are generally resolved in favor of granting relief. (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 433 [121 Cal.Rptr.2d 844, 49 P.3d 194].)

■ "One purpose of declaratory relief is ' " 'to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation.' " ' [Citation.] ' " 'One test of the right to institute proceedings for declaratory judgment is the necessity of present adjudication as a guide for plaintiff's future conduct . . . to preserve his legal rights.' " ' " (*American Meat Institute v. Leeman, supra,* 180 Cal.App.4th at pp. 741–742.) " 'The "actual controversy" referred to in [Code of Civil Procedure section 1060] is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' " (*Id.* at p. 741.)

■ We conclude the dispute as to whether the Association or the City is responsible for maintaining the berm presented an "actual controversy" within the meaning of Code of Civil Procedure section 1060. While the berm does not currently need maintenance, the party with the maintenance responsibility will be required to monitor the situation. It was in the parties' interest for the Association to take action now to determine the matter, as without the court's guidance the parties' roles would be unclear. The judgment is based on documents controlling the parties' relationship; it is not merely an advisory opinion based on hypothetical facts. Further, the court properly exercised its discretion by not declining to entertain the declaratory relief claim under Code of Civil Procedure section 1061.

■ Contrary to the City's position, the Association was not required to show a declaration of the parties' rights would altogether avoid future litigation. In *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647 [88 Cal.Rptr.3d 859, 200 P.3d 295], the court explained that one purpose of declaratory relief is the avoidance of future litigation. Further, the court's ruling here may actually avoid future litigation. The court expressly rejected the City's "argument regarding its concern over a multiplicity of lawsuits."

II

*Merits of Ruling*

A

■ "California courts have long recognized that the interpretation of a written instrument is a judicial function unless the interpretation turns upon the credibility of extrinsic evidence . . . ." (*The Lundin/Weber Co. v. Brea Oil Co., Inc.* (2004) 117 Cal.App.4th 427, 433 [11 Cal.Rptr.3d 768].) The parties

presented no extrinsic evidence on the meaning of section S.W.—109.2 of the SUP. It unambiguously provides: "The [C]ity shall accept interior waterways as fee lands for dedication and maintenance, including maintenance of the easement and right-of-way areas reserved by the developer. Maintenance shall include any redredging necessary in the future to maintain original dredged depths." As a matter of law, this provision requires the City to maintain the berm, as it is located within the waterway dedicated to the City (Lot C) and within the portion of Lot C reserved by the developer (Lot 90-A and 90-B).

▇ The City cites the general rule that an easement owner is presumed to be responsible for its maintenance. The City relies on *Rose v. Peters* (1943) 59 Cal.App.2d 833, 835 [139 P.2d 983], which explains, "it [is] settled that ordinarily the owner of an easement is required to keep it in repair, but it is a monotonous truism that the parties may alter their legal obligations by contract." Here, however, section S.W.—109.2 of the SUP rebuts any arguable presumption the developer or its successor assumed the responsibility for maintaining the berm.

B

The City's argument is primarily based on language in Map No. 6181 pertaining to the developer's responsibility to maintain in the reserved easement, Lot 90-A and 90-B, such things as docks, ramps, decks, landings and "ancillary structures for bulkheads and similar or related wharfage facilities." The City asserts the term "ancillary structures" is ambiguous and the court erred by not construing it in favor of the City to include the berm.

▇ "[P]arol evidence is properly admitted to construe a written instrument when its language is ambiguous. The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' " (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) "The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the [document]." (*Ibid.*)

Based on the extrinsic evidence presented, the court found Map No. 6181 is not reasonably susceptible of the interpretation that the berm is an

"ancillary structure" whose maintenance was relegated to the developer.[3] The court explained: "The berm was not added and was not constructed. The berm existed before the bulkheads. The berm consists of native soil that was graded. This was probably of some significance in the terms of what was in the minds of the drafters of the [SUP] and the dedication and acceptance language in Map [No.] 6181." The court also noted the term "berm" is not used anywhere in Map No. 6181.

The threshold determination on the question of ambiguity is a question of law we review independently. (*Winet v. Price, supra,* 4 Cal.App.4th at p. 1165.) We agree with the court's assessment. Contrary to the City's position, Map No. 6181 is not ambiguous merely because it does not define the term "ancillary structures." (*Aerojet-General Corp. v. Commercial Union Ins. Co.* (2007) 155 Cal.App.4th 132, 140 [65 Cal.Rptr.3d 803].) The adjective "ancillary" modifies the noun "structures," and thus if the berm is not a structure it cannot be an ancillary structure. The term "structure" commonly means "something (as a building) that is constructed." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 1238.) The court found the berm is "not a structure." The berm consists of native soil into which the bulkheads were imbedded before the waterway was dredged. While the berm is situated against the bulkheads and passively holds them in place, it is not a structure within the common meaning of the term.

Alternatively, the City asserts the berm meets the SUP's definition of the term "structure" as "[a]nything constructed or erected, the use of which requires more or less permanent location on the ground or attachment to the ground or attachment to something having a fixed location on the ground." To any extent this definition applies to Map No. 6181, we are unpersuaded. Rather than being located on or attached to the ground, the berm itself was *the ground* when the bulkheads were constructed. We conclude Map No. 6181 is unavailing to the City.

We also agree with the court's finding the term "bulkheads" in the phrase "ancillary structures for bulkheads and similar or related wharfage facilities" cannot reasonably be interpreted to mean the bulkheads that are located on Lot 90. The court's statement of decision explains: "If the map language was given to someone who did not know what the context was, the reading of the plain English would say that the ancillary structures refer to bulkheads related to wharfage, and not related to the berm or the bulkheads, which are the subject of this dispute." In the City's interpretation, the words "and similar or related wharfage facilities" are ignored. Map No. 6181 states the City accepted "all of Lot C . . . , not including bulkheads, for use as public and

---

[3] The court's statement of decision states: "The map language can be read the way the City reads it, but the City's interpretation is not reasonable and is contradicted by other facts."

navigable waterways," and since the bulkheads in question are on Lot 90 rather than Lot C, the map must be referring to any bulkheads and ancillary structures that could be constructed in the developer's reserved area of the waterway (on Lot 90-A and 90-B) for wharfage purposes.

█ The City argues the court was required to construe the language in Map No. 6181 in its favor under Civil Code section 1069, which provides: "A grant is to be interpreted in favor of the grantee, except that a reservation in any grant, and every grant by a public officer or body, as such, to a private party, is to be interpreted in favor of the grantor." The statute's directive, however, applies only if there is an ambiguity in the grant or reservation. (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 344 [48 Cal.Rptr.3d 875].) We have affirmed the court's ruling that the map language is not reasonably susceptible of the interpretation the City urges. Civil Code section 1069 does not stand for the proposition that unambiguous grant or reservation language must be construed in a municipality's favor. When no ambiguity exists, no construction is required.

III

*Judgment Language*

The City also requests that we modify the judgment to conform to the statement of decision. The judgment provides: "The . . . City . . . has the responsibility for maintaining the berm located on lot C of Coronado Cays Two, as shown on Map No. 6181, . . . and the . . . Association is to maintain the bulkheads located adjacent thereto on Lot 90 of . . . Coronado Cays Two." The City complains that the judgment does not include the following paragraph included in the statement of decision: "The Court's ruling is limited to the determination of the responsibilities of the respective parties as to the maintenance of the berm on Lot C. While there was uncontradicted expert testimony that the berms have stabilized and are not in risk of failure, the Court makes no finding about what if any maintenance needs to be done now. Also, the Court makes no determination whether this ruling is limited to the [SUP] and thus makes no ruling about what happens in 2016 when the [SUP] expires."

█ The City forfeited the issue by approving the judgment as to form. In any event, the judgment is proper because it sets forth the declaratory relief the court gave. A judgment should not include issues not decided. "That only is deemed to have been adjudged in a former judgment which appears upon its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto." (Code Civ. Proc., § 1911.)

## DISPOSITION

The judgment is affirmed. The Association is entitled to costs on appeal.

Nares, J., and Irion, J., concurred.