Filed 12/26/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| CITY OF WHITTIER, | B321450 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20NWCV00143) |
| v. | |
| EVEREST NATIONAL INSURANCE COMPANY et al., | ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) |
| Defendants and Respondents. | |


THE COURT:

The opinion in the above-entitled matter filed on December 6, 2023 is modified as follows:


1.      On page 28, in the paragraph continuing from the previous page, the final sentence, beginning "Section 533 thus does not bar indemnifying . . .", is deleted.


2.      On page 28, the first full paragraph, beginning, "Because the *Rivera* complaint alleged liability . . ." is deleted, and replaced with, "Although we conclude the *Rivera* complaint

itself does not base liability on necessarily willful conduct, we express no opinion whether the insurers may defeat or reduce the City's coverage claim by showing, for example, that the City's conduct was in fact willful, and/or that some or all of the settlement is in fact allocable to willful conduct. The trial court may address such issues on remand should the parties wish to raise them."

3. In the final paragraph of page 32, continuing onto page 33, the last two sentences are modified to read, "Everest did not assert this policy language in its motion for summary judgment to argue it defeats the City's indemnification claim for the *Rivera* settlement, nor did it assert it on appeal. We thus express no opinion on that issue and nothing herein is intended to preclude such argument on remand or foreshadow how we would rule on it."

There is no change in judgment. Respondent Everest National Insurance Company's petition for rehearing is denied.

_____

  BENDIX, Acting P. J.          WEINGART, J.

    I would grant rehearing.

_____

  CHANEY, J.

Filed 12/6/23 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION†**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF WHITTIER, | B321450 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20NWCV00143) |
| v. | |
| EVEREST NATIONAL INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Margaret Miller Bernal, Judge. Affirmed in part, reversed in part, and remanded.

---

† Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of part B of the Discussion.

Woolls Peer Dollinger & Scher, Jeffrey A. Dollinger, H. Douglas Galt and Brian W. Walsh for Plaintiff and Appellant.

Selman Leichenger Edson Hsu Newman Moore, Sheryl W. Leichenger, Eldon S. Edson and Laura R. Ramos for Defendant and Respondent, Everest National Insurance Company.

Musick, Peeler & Garrett, Lawrence A. Tabb and Jennifer M. Kokes for Defendant and Respondent Starr Indemnity & Liability Company.

_____

This appeal presents a question of first impression: whether Insurance Code section 533 (section 533), under which "[a]n insurer is not liable for a loss caused by the wilful act of the insured," bars indemnification for claims under Labor Code section 1102.5. Labor Code section 1102.5 prohibits, inter alia, retaliation against employees for reporting activity they have reasonable cause to believe is unlawful, or for refusing to participate in activity that actually is unlawful.

This is an important question whose answer will influence enforcement of our employment laws. How so? Retaliation claims are the most common employment claims in California. For fiscal years 2016 through 2022, retaliation claims of all types were the majority of charges filed in California with the United States Equal Employment Opportunity Commission (EEOC). (See EEOC, FY 2009-2022 EEOC Charge Receipts for CA.)[1] In 2019, retaliation was the most common basis for right-to-sue

_____

[1] Available at <https://www.eeoc.gov/statistics/enforcement/charges-by-state/CA> (as of Nov. 16, 2023), archived at <https://perma.cc/Y5ZB-4P4Z>.

requests filed with the California Department of Fair Employment and Housing (DFEH). (DFEH, 2019 Annual Report, at p. 9.)[2]

The availability of insurance is a key component of enforcing our employment laws and of an ordered workplace. The availability of insurance can ameliorate risk of collection against potentially judgment-proof employers while also providing expeditious compensation via settlement. Insurance also ameliorates financial risk to employers choosing to defend employment claims they believe are weak.

We decide this question upon the trial court's grant of summary judgment against the insured City of Whittier (the City), in favor of its insurers, respondents Everest National Insurance Company (Everest) and Starr Indemnity & Liability Company (Starr). The City sought indemnification for settlement of a lawsuit alleging retaliation under Labor Code section 1102.5. In that lawsuit, police officers alleged retaliatory discipline when they objected to, and refused to comply with, a purported illegal citation and arrest quota system and the use of shift averaging to compare officers' arrest counts in evaluating their job performance. The trial court concluded the police officers' complaint necessarily involved willful conduct, thus barring indemnification under section 533.

We disagree. As we explain in our Discussion, *post*, the parties rely on jurisprudence, first developed in underlying sexual molestation and assault cases, that equates "wilful" with inherently harmful or intentional. Because we conclude not all

_____

[2] Available at <https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2020/10/DFEH_2019AnnualReport.pdf> (as of Nov. 16, 2023), archived at <https://perma.cc/8867-L84N>.

3

Labor Code section 1102.5 claims involve necessarily willful conduct, but rather some involve conduct more akin to negligence, the trial court erred when it found to the contrary in granting summary judgment in favor of Everest and Starr.

In the unpublished portion of this opinion, we agree with Starr's alternative argument that its specific policy language does not obligate it to indemnify the City for the settlement.

Accordingly, we reverse the judgment as to Everest, and affirm the judgment as to Starr under Starr's alternative argument.

## BACKGROUND

1. ***The insurance policies***

    a. **The Everest policies**

Everest issued four public entity excess liability insurance policies to the California Insurance Pool Authority (CIPA),[3] and included the City as a named insured and member agency. The policies provided coverage for employment practice liability of $10 million per "wrongful act" in excess of a retained limit of $1 million.

The policies stated, "We will pay on your behalf, the 'ultimate net loss,' in excess of the 'retained limit,' that the insured becomes legally obligated to compensate others for loss arising out of your 'employment practice liability wrongful

---

[3] CIPA is a "joint powers authority," i.e., a group of member municipalities that agree to jointly exercise municipal powers such as, for example, contracting for group insurance. (See Gov. Code, § 6500 et seq.; *The City of Oakland v. Williams* (1940) 15 Cal.2d 542, 547–548.)

act'. . . ." The policies defined " '[u]ltimate net loss,' " as "the total sum . . . actually paid or payable due to a 'claim' or 'suit' for which you are liable either by a settlement to which we agreed or a final judgment, and shall include defense costs."

Under the policies, " '[e]mployment practice liability wrongful act' " included " 'retaliation.' "

### b.  The Starr policies

Starr issued two public entity excess liability policies to CIPA and included the City as a named insured. Like the Everest policies, the Starr policies provided coverage for employment practice liability of $10 million per "wrongful act" in excess of a retained limit of $1 million. The policies provided, "We will pay on your behalf sums in excess of the retained limit that the insured becomes legally obligated to pay for damages to compensate others for loss arising out of your employment practice liability wrongful act . . . ." Again like the Everest policies, the Starr policies included "retaliation" in the definition of "[e]mployment practice liability wrongful act."

## 2.  *Underlying lawsuit*

On March 3, 2015, six officers in the Whittier Police Department, including Joseph Rivera (the *Rivera* plaintiffs), filed a complaint against the City in the Los Angeles County Superior Court. (*Rivera et al. v. City of Whittier*, No. BC574443.) The complaint alleged the police department instituted "an unlawful citation and arrest quota in violation of California Vehicle Code sections 41600 *et seq.* on its officers, and illegally compared officers using shift averaging as a means of determining a benchmark for performance." The complaint further alleged the police department "retaliated against those [who] refused to

5

participate in and/or reported the unlawful citation and arrest quota," including, inter alia, "negative language and/or documentation being placed in [plaintiffs'] personnel packages about their refusal to comply with the unlawful quota, unwarranted counseling sessions, unwarranted increased scrutiny, unwarranted transfers, [and] disparaging comments made about them." We provide more information about the allegations in our Discussion, *post*.

The City notified Everest and Starr about the *Rivera* action, advising that the plaintiffs sought damages exceeding $1 million and there was a potential for coverage under the insurers' policies.

Prior to trial, the City's counsel notified the insurers of an upcoming mediation session and demanded that they attend. Everest's and Starr's coverage counsel attended the mediation, at which the City negotiated a settlement with the *Rivera* plaintiffs and agreed to pay $3 million to resolve the action. Neither Everest nor Starr consented to the settlement.

The City paid the $3 million, and the *Rivera* action never went to trial or resulted in a judgment. On December 24, 2019, counsel for CIPA and the City tendered the *Rivera* settlement to Everest and Starr for indemnity under their respective policies. The insurers denied the request for indemnity.

### 3.    *The instant lawsuit*

On February 26, 2020, the City filed this action against Everest and Starr, asserting causes of action for declaratory relief, breach of contract, and bad faith. The City alleged the insurers owed a duty to indemnify the City in connection with the *Rivera* settlement. The parties stipulated to referring to a referee

6

all issues pertaining to the City's causes of action for declaratory relief and breach of contract.

The insurers each moved for summary judgment, and the City moved for summary adjudication. As relevant to this appeal, the insurers contended retaliation claims under Labor Code section 1102.5 can be established only through proof of an employer's willful acts, and section 533 therefore barred indemnity. Starr argued in the alternative that its policy required indemnification only of "damages," which did not include amounts paid in prejudgment settlement. In its motion, the City contended section 533 did not bar indemnity and therefore the insurers were in breach of the insurance contracts.

In a statement of decision, the referee agreed with the insurers, finding no triable issue existed as to whether the insurers owed the City indemnification of the *Rivera* settlement. The referee reasoned that section 533 prohibits coverage for loss caused by an insured's willful act, and whistleblower retaliation under Labor Code section 1102.5 " 'can *only* be established by evidence of an employer's motive and intent to violate or frustrate' California's Whistleblower laws." The referee granted the insurers' motions for summary disposition and denied the City's motion.

The trial court adopted the referee's statement of decision as its own. At the City's request, the court dismissed without prejudice the cause of action for breach of the covenant of good faith and fair dealing, which was neither addressed nor resolved by the various motions for summary disposition. The court then entered judgment for the insurers.

The City timely appealed.

## STANDARD OF REVIEW

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)  We review the trial court's summary judgment rulings de novo.  (*Barber v. Southern California Edison Co.* (2022) 80 Cal.App.5th 227, 241.)

## DISCUSSION

### A.    Section 533 Does Not Bar Coverage of the *Rivera* Settlement

The trial court concluded section 533 bars the insurers from indemnifying the City for the settlement of the *Rivera* plaintiffs' claims under Labor Code section 1102.5.  We first set forth the relevant statutes and case law applying section 533.

#### 1.    Relevant statutes

##### a.    *Labor Code section 1102.5*

Labor Code section 1102.5 "provides whistleblower protections to employees who disclose wrongdoing to authorities" (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 709 (*Lawson*)), as well as to employees who refuse to participate in illegal activities (see *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 718 (*Nejadian*)).

Labor Code section 1102.5, subdivision (b) states, in relevant part:  "An employer . . . shall not retaliate against an employee for disclosing information . . . to a government or law

enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation . . . ."

Labor Code section 1102.5, subdivision (c) states, in relevant part:  "An employer . . . shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

To prevail on a claim under Labor Code section 1102.5, a plaintiff must prove "that he engaged in protected activity," such as a disclosure under subdivision (b) or a refusal to participate under subdivision (c), "that he was subjected to adverse employment action by his employer, and that there was a causal link between the [protected activity] and the adverse action." (See *Manavian v. Department of Justice* (2018) 28 Cal.App.5th 1127, 1141 (*Manavian*).)  For purposes of the statute, an adverse employment action is one that " 'materially affects the terms, conditions, or privileges of employment.'  [Citations.]" (*Francis v. City of Los Angeles* (2022) 81 Cal.App.5th 532, 541.)

### b.    Section 533

Section 533 of the Insurance Code provides, "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."  This section is " 'an implied

9

exclusionary clause which by statute is to be read into all insurance policies.' [Citations.]" (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1019 (*J. C. Penney*).) "As a statutory exclusion, section 533 is not subject to the rule of strict construction against an insurer." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 739 (*Shell Oil*).)

A "wilful act" under section 533 means "an act deliberately done for the express purpose of causing damage or intentionally performed with knowledge that damage is highly probable or substantially certain to result." (*Shell Oil*, *supra*, 12 Cal.App.4th at p. 742.) Section 533 also "precludes indemnification, whether or not the insured subjectively intended harm, if the insured seeks coverage for an intentional, wrongful act that is inherently and necessarily harmful." (*Shell Oil*, at pp. 740–741.) The statute "does not preclude coverage for acts that are negligent or reckless." (*J. C. Penney*, *supra*, 52 Cal.3d at p. 1021.)

Section 533 reflects a fundamental public policy of denying coverage for willful wrongs and discouraging willful torts. (*J. C. Penney*, *supra*, 52 Cal.3d at pp. 1019–1020, fn. 8 & 1021.) " 'The public policy against insurance for losses resulting from such [wilful wrongful] acts is usually justified by the assumption that such acts would be encouraged, or at least not dissuaded, if insurance were available to shift the financial burden of the loss from the wrongdoer to the insurer. . . .' [Citation.]" (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 514.) Accordingly, parties cannot contract for coverage precluded by section 533. (*J. C. Penney*, at pp. 1019–1020, fn. 8.)

## 2. Case law applying section 533

We have found no case in California or elsewhere addressing whether section 533 bars coverage of claims under

10

Labor Code section 1102.5.  The trial court and the insurers analogize to *B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78 (*B & E Convalescent Center*) and federal district court cases applying it, all of which address retaliation claims in contexts other than Labor Code section 1102.5.  *B & E Convalescent Center*, in turn, relies on *J. C. Penney*, *supra*, 52 Cal.3d 1009 and *Fire Ins. Exchange v. Altieri* (1991) 235 Cal.App.3d 1352 (*Altieri*).  We summarize each case in turn.

### a.    J. C. Penney

*J. C. Penney*, a foundational case on the application of section 533, concerned whether that statute barred coverage of claims arising from the sexual molestation of a five-year-old girl.[4] (*J. C. Penney*, *supra*, 52 Cal.3d at p. 1014.)  The parties seeking coverage were the victim and her mother, who had won a $500,000 judgment against the molester and sought payment from the molester's homeowner's liability insurer.  (See *ibid.*)  The mother and child argued "that even an intentional and wrongful act is not excluded from coverage unless the insured acted with a 'preconceived design to inflict injury.' " (*Id.* at p. 1019.)  They contended "psychiatric testimony shows that molesters . . . often intend no harm despite the depravity of their acts, and that the molestation is often a misguided attempt to display love and affection for the child." (*Ibid.*)

Our Supreme Court rejected these arguments, stating, "No rational person can reasonably believe that sexual fondlings, penetration, and oral copulation of a five-year-old child are

---

[4] The high court noted the lack of legislative history for section 533.  (*J. C. Penney*, *supra*, 52 Cal.3d at p. 1020.)

11

nothing more than acts of tender mercy." (*J. C. Penney, supra*, 52 Cal.3d at p. 1019.) Although "section 533 does not preclude coverage for acts that are negligent or reckless," "[t]here is no such thing as negligent or even reckless sexual molestation. The very essence of child molestation is the gratification of sexual desire. The act is the harm. There cannot be one without the other. Thus, the intent to molest is, by itself, the same as the intent to harm. (*Id.* at p. 1021; see *id.* at p. 1026 ["Some acts are so inherently harmful that the intent to commit the act and the intent to harm are one and the same."].) Accordingly, the insurer could deny coverage without showing the molester subjectively intended to inflict harm, "because child molestation is *always* intentional, it is *always* wrongful, and it is *always* harmful." (*Id.* At p. 1025.)

The court clarified the holding of *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865,[5] the case relied upon by the mother and child for the proposition that section 533 applies only when the tortfeasor acts with a " 'preconceived design to inflict injury.' " (*J. C. Penney, supra*, 52 Cal.3d at p. 1023.) As the *J. C. Penney* court explained, at issue in *Clemmer* was whether the tortfeasor had the "mental capacity to commit the wrongful act," that is, "whether he was legally sane" when he shot and killed his employer. (*Ibid.*) *Clemmer*'s use of the phrase " 'preconceived design to inflict injury' " referred not to the tortfeasor's subjective intent to cause injury, but his mental capacity to intend the wrongful act itself. (See *ibid.*) *Clemmer* therefore did not support the mother and child's argument that the molester's

---

[5] *Clemmer* later was overruled on other grounds by *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124.

12

intent to cause harm was relevant to section 533 analysis. (See *J. C. Penney*, at p. 1023.)

*J. C. Penney* explained that the mother and child's argument, "[p]roperly understood," went not to the molester's intent, but to his motive, which mother and child contended was "something akin to a misguided show of affection." (*J. C. Penney*, *supra*, 52 Cal.3d at p. 1026.) But "[m]otive is irrelevant for purposes of section 533. Motive is relevant only to the different question of whether the conduct was wrongful, thereby giving rise to liability." (*J. C. Penney*, at p. 1026.) As an example, the court posited a person who "intentionally shoot[s] another person in the head at point-blank range. Obviously, the insured (if sane) intends to injure. Whether the conduct is wrongful, however, will depend on the insured's motive." (*Ibid.*) If the motive is self-defense and "a court finds that the insured acted justifiably, it necessarily follows that the insured did not act wrongfully," in which case "there is no liability, and the application of section 533 is not at issue." (*J. C. Penney*, at p. 1026.) Because "[t]here is no motive that can justify sexual molestation," however, the molester's "professed motive is . . . entirely beside the point for purposes of section 533." (*J. C. Penney*, at p. 1027.)

### b.     Altieri

In *Altieri*, a teenage minor struck a schoolmate in the face, causing serious injuries. (*Altieri*, *supra*, 235 Cal.App.3d at p. 1354.) The victim sued the teenage minor and his parents for personal injury. The parties stipulated to a judgment in an amount assuming coverage under the defendants' homeowners policy. The carrier then brought a declaratory relief action. (*Ibid.*) The trial court, relying on *Clemmer*, ruled section 533 did not apply absent proof the teenager intended not only to

13

strike his schoolmate, but also to cause the serious injuries. (*Ibid.*)

The Court of Appeal reversed, relying on *J. C. Penney*. (*Altieri, supra*, 235 Cal.App.3d at p. 1357.) The court framed the issue as "whether [the teenager's] actions in assaulting [the schoolmate] were inherently harmful." (*Id.* at p. 1359.) In making that determination, the teenager's alleged subjective intent not to hurt his schoolmate badly was irrelevant. (*Ibid.*) His motive was "relevant *only* to the issue of whether his conduct was wrongful in the first instance." (*Ibid.*) Because it was undisputed the teenager did not act in self-defense, his motive was irrelevant to the coverage issue. (*Ibid.*) "He may not have intended to hurt [the schoolmate] 'bad' but he did intend, without *any* legal justification, to hit him. [The teenager's] conduct was inherently harmful and wrongful," and thus "an uninsurable willful act under section 533." (*Altieri*, at pp. 1359–1360.)

### c.     B & E Convalescent Center

*B & E Convalescent Center* involved an insured employer's declaratory relief, breach of contract, and bad faith claims against State Compensation Insurance Fund arising out of that Fund's refusal to defend the employer in an employee's wrongful termination claim. (*B & E Convalescent Center, supra*, 8 Cal.App.4th at p. 83.) The Court of Appeal applied *J. C. Penney* and *Altieri* to hold there was no potential for coverage and therefore no duty to defend because section 533 bars coverage for an employee's claims, inter alia, for wrongful termination and violation of the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA). (*B & E Convalescent Center*, at pp. 83–84, 98.)

14

The employee alleged she had been fired for "refus[ing] to carry out instructions to interfere with the efforts of a union which had sought to organize the employees," and for "refus[ing] the demands of her employer that she systematically terminate . . . employees and replace them with employees of Filipino national origin, who, the employers believed, would be less likely than others to vote for the union." (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 84.) The appellate court characterized this claim as a "*Tameny*" action for "wrongful termination in contravention of a fundamental public policy," in this case "retaliation for [the employee's] refusal (1) to engage in antiunion activity violative of the [National Labor Relations Act] and (2) to participate in discriminatory employment practices violative of the FEHA." (*B & E Convalescent Center*, at pp. 90, 92; see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.)[6] The employee further alleged that, in violation of FEHA, she had been "terminated on the basis of her gender, age, and ethnic origin, in that she was a woman over 60 years of age and of English national origin and was replaced by a man, younger than she, and of Filipino descent." (*B & E Convalescent Center*, at pp. 84–85.)

The court concluded the employee's claims alleged willful conduct: "A termination affirmatively undertaken with the intent to interfere with protected labor union rights or

---

[6] Labor Code section 1102.5, subdivision (c) similarly prohibits retaliation against an employee for refusing to participate in an activity that violates a state or federal statute, rule, or regulation. That subdivision, however, had not yet been enacted at the time of *B & E Convalescent Center*. (See Stats. 2003, ch. 484, § 2.)

15

discriminate on the basis of gender, age, or ethnic origin cannot be the result of negligence.  An affirmative act which can only violate the law when it is accompanied by such an impermissible motivation *necessarily* involves willful and intentional misconduct." (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 95.)

The court summarized *J. C. Penney* and *Altieri*, stating that under those cases "section 533 precludes indemnification by insurance for any 'intentional and wrongful act if the harm is inherent in the act itself.' " (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 98.)  "A termination of employment for which a tort action will lie under *Tameny* and its progeny is such an act." (*Ibid.*)

The court then explained how the employee's claims alleged acts that were intentional, inherently harmful, and wrongful.  "It is well established and generally self-evident that the act of terminating an employee is an intentional act." (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 98.)  Also, "it can hardly be denied that a termination from employment in violation of antidiscrimination statutes or other fundamental and substantial public policies is inherently harmful.  It does not require extensive discussion to demonstrate the devastating impact of the loss of a job, whether from a financial, psychological or emotional point of view.  When that occurs in the context of an employer's discrimination against an employee's sex, age, race or national origin or in an effort to defeat nationally established rights to bargain collectively, it is devastating not only to the employee but to the body politic as well." (*Ibid.*)

As to the question of whether the employee had alleged wrongful conduct as that term was used in *J. C. Penney* and

*Altieri*, the court noted that *Tameny* actions redress " 'a discharge [that] clearly violated an express statutory objective or undermined a firmly established principle of public policy.' [Citation.]" (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 98.) "A civil action under *Tameny* serves 'firmly established,' 'fundamental,' and 'substantial' public policies that are 'embodied in the state Constitution.' [Citations.]" (*Id.* at p. 99.)

The court concluded, "Under any reasonable criterion, a termination in violation of such public policies must be held *wrongful as a matter of law*. As we have pointed out, such claim can *only* be established by evidence of an employer's motive and intent to violate or frustrate the law(s) declaring or establishing fundamental public policy. It would be unreasonable, mischievous and improper if section 533, which reflects the 'fundamental public policy of denying coverage for willful wrongs' [citation], were construed in any way other than to deny insurance coverage in the most certain and unambiguous terms for willful and intentional acts that contravene 'fundamental policies that are delineated in constitutional or statutory provisions' [citation]." (*B & E Convalescent Center*, *supra*, 8 Cal.App.4th at p. 99.)

### d.  *Federal district court cases*

In *Markel American Ins. Co. v. G.L. Anderson Ins. Services, Inc.* (E.D. Cal. 2010) 715 F.Supp.2d 1068, the district court ruled that section 533 barred coverage of an employee's claims for retaliation and wrongful termination in violation of public policy. (*Markel*, at p. 1077.) The employee alleged she was terminated for "complain[ing] about sexual harassment in the work place." (*Ibid.*) Citing *B & E Convalescent Center*, the district court found, "A termination affirmatively undertaken with the intent

17

to interfere with sexual discrimination laws and in violation of public policy cannot be the result of negligence because liability '*necessarily* involves willful and intentional misconduct' based upon impermissible motivation. [Citation.] A termination in violation of FEHA or public policy can '*only* be established by evidence of an employer's motive and intent to violate or frustrate the law(s) declaring or establishing fundamental public policy.' [Citation.]" (*Markel*, at p. 1077.)

In *Valley Imaging Partnership Medical Group, L.P. v. RLI Insurance Co.* (C.D. Cal. Sept. 14, 2007, No. CV 06-4595 ABC (PLAx)) [2007 WL 9734496],[7] the district court relied on *B & E Convalescent Center* to conclude section 533 barred coverage of an arbitration award for a claim of retaliation, specifically an employee's termination after she gave a deposition in a sexual harassment lawsuit brought by another employee. (*Valley Imaging*, at pp. *1, *3.)[8] The district court stated that the arbitrator's decision was based "almost entirely" on the individual defendant's admission in the arbitration that the employee was terminated for giving a deposition in support of another employee's sexual harassment case. (*Valley Imaging*, at

---

[7] Unpublished federal opinions have persuasive value and are not subject to California Rules of Court, rule 8.1115, which governs citation to unpublished California opinions. (See *Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28, 34.)

[8] *Valley Imaging* does not specify the statutory basis for the retaliation claim at issue. The arbitration award for which the insured sought indemnity, however, relied on CACI 2505, the jury instruction for retaliation under FEHA. (See *Lomeli v. Valley Imaging Partnership* (Super. Ct. Los Angeles County, Dec. 15, 2005, No. BC311065) [2005 WL 6298989].)

18

p. *4.)  The court reasoned, "Like wrongful termination claims, a retaliation claim necessarily entails proof of a 'wilful act' under section 533.  A plaintiff must prove that the employer took some sort of adverse employment action because of protected activity.  An employer cannot be liable for negligent, or even reckless, conduct, and there can be no legal 'justification' for retaliatory actions."  (*Valley Imaging*, at p. *3.)

### 3. Claims under Labor Code section 1102.5 do not necessarily involve willful conduct under section 533

Given the significant number of retaliation cases in our courts and importance of insurance in resolving those cases and securing compensation for injured employees, we tread carefully in applying the above jurisprudence to a new category of claims.

We agree with *B & E Convalescent Center*, *Markel*, and *Valley Imaging* that the alleged or proven acts of the employers in those cases were willful under section 533.  To the extent, however, those cases can be read more broadly to assert that *any* retaliation against an employee engaging in protected conduct is per se willful under section 533, we disagree.

Although Labor Code section 1102.5 encompasses the sort of misconduct in *B & E Convalescent Center*, *Markel*, and *Valley Imaging*, in which employers punished employees who either reported clearly unlawful conduct or refused to participate in it, the statute is not limited to such obviously intentional misconduct.  Indeed, it is conceivable an employer could be found liable under Labor Code section 1102.5 despite making concerted and reasonable efforts to *avoid* violating the law.

This is best illustrated by claims brought under subdivision (c) of Labor Code section 1102.5.  Unlike

19

subdivision (b) of that section, which protects an employee's right to report what the employee has reasonable cause to believe is a violation of the law, subdivision (c) addresses the situation in which an employee does not merely report, but refuses to comply with an employer's directives. (Lab. Code, 1102.5, subd. (c) ["An employer . . . shall not retaliate against an employee for refusing to participate in an activity that would result in a violation" of law].) The law is less protective of employees in this circumstance—whereas an employee's disclosures are protected under subdivision (b) so long as the employee has reasonable cause to believe the conduct at issue is illegal, an employee is protected under subdivision (c) only if the activity in which the employee refuses to participate is *actually* illegal. (*Nejadian*, *supra*, 40 Cal.App.5th at p. 719.)

Thus, in a trial on a claim under Labor Code section 1102.5, subdivision (c), the court must " 'determine the legal question whether the identified activity would result in a violation or noncompliance with [an] identified statute, rule, or regulation . . . .' [Citation.]" (*Zirpel v. Alki David Productions, Inc.* (2023) 93 Cal.App.5th 563, 573.) If that question is one of first impression, an employer might not discover it has "retaliate[d]" against an employee for purposes of Labor Code section 1102.5, subdivision (c) until the claim is brought to trial and a court has determined the activity the employer directed the employee to perform does, in fact, violate a statute, rule, or regulation.

Further, liability under Labor Code section 1102.5, subdivision (c) does not require proof of bad faith, malice, or punitive intent on the part of the employer. To prove the employer's intent to retaliate, a plaintiff need only show that the protected activity—for example, the employee's refusal to

20

participate in unlawful activity—was a "contributing factor" to the adverse employment action.  (Lab. Code, § 1102.6; *Lawson*, *supra*, 12 Cal.5th at p. 712; see *Manavian*, *supra*, 28 Cal.App.5th at p. 1141 [plaintiff must show "a causal link between the [protected activity] and the adverse action"].)  This means an employer can be held liable for an adverse employment action against an employee who refuses to participate in an unlawful activity even if the employer honestly believes the activity is lawful and acts not to punish, but to mitigate the harm to the employer's business from what it believes is an insubordinate employee.

Labor Code section 1102.5, subdivision (c) thus creates the potential for the following scenario:

Faced with what appears to be an insubordinate employee, an employer evaluates the legality of the activity in which the employee refuses to participate, for example by consulting with counsel, reviewing guidance from a trade association, or other similar efforts.  The activity's legality is unclear under the applicable statute, rule, or regulation, and has never been decided by a court.  The employer therefore makes its best determination and concludes the activity is legal.  The employer so informs the employee, the employee continues to refuse to participate in the activity, and the employer fires the employee to prevent further disruption of its business.  The employee sues, and the trial court decides as a matter of first impression that the activity in which the employee refused to participate violates a statute, rule, or regulation.  It is not a defense to the employee's claim that reasonable minds could differ as to the legality of the activity.  Under this scenario and the statute, the employer has

21

retaliated against an employee for engaging in protected conduct, and the employee is entitled to backpay among other remedies.

Liability is proper in this scenario—the employee, having opposed the employer's unlawful directives, should not bear the burden of the employer's mistake in believing those directives were lawful.  It does not follow, however, that the employer, despite acting in good faith and taking reasonable steps to avoid violating the law, has nonetheless engaged in intentional, inherently harmful, and "wilful" conduct depriving the employer of insurance under section 533.

The employer's conduct in our scenario is not comparable to that in *B & E Convalescent Center*, where the employer retaliated against the employee for refusing to engage in activity that was illegal under clearly established law.  Although whistleblower protections themselves are clearly established, the illegality of the underlying conduct the whistleblower is resisting may not be.  In *B & E Convalescent Center* the employer had the "impermissible motivation" "to interfere with protected labor union rights or discriminate on the basis of gender, age, or ethnic origin." (*Supra*, 8 Cal.App.4th at p. 95.)  The employer in our posited scenario, in contrast, does not intend to interfere with the employee's right not to engage in unlawful conduct, because the employer reasonably does not know the conduct is unlawful.  Further, the employer's motivation for the adverse employment action is not revenge or punishment, but prevention of further harm to its business from a recalcitrant employee.

Doctrinally, the employer's conduct in our scenario is closer to negligence than intentional misconduct.  The employer intends the act—the adverse employment action—but not the consequence—a violation of the employee's rights under Labor

Code section 1102.5, rights that do not become clear until a court has decided the legality of the conduct in which the employee refused to participate.

Our scenario shares characteristics with disparate impact discrimination, a workplace tort courts have deemed "unintentional" and not subject to the indemnity prohibition of section 533. (See *Save Mart Supermarkets v. Underwriters at Lloyd's London* (N.D. Cal. 1994) 843 F.Supp. 597, 606; accord, *Melugin v. Zurich Canada* (1996) 50 Cal.App.4th 658, 665 [citing *Save Mart Supermarkets* with approval].) A plaintiff may prove disparate impact discrimination without showing the employer had an intent to discriminate—instead, the plaintiff must show "that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20; accord, *Mahler v. Judicial Council of California* (2021) 67 Cal.App.5th 82, 112.) Thus, the employer's wrongdoing appears not at the time it institutes the policy or practice, but in a subsequent retrospective analysis of the impact of that policy or practice.

Similarly, a plaintiff may prevail under Labor Code section 1102.5 even if the employer had good reason to believe the activity in which it ordered the plaintiff to engage was lawful, so long as, in retrospect, a court determines the activity was in fact unlawful.[9]

---

[9] We recognize an employer might institute an ostensibly neutral policy or practice with the intention of disproportionately impacting a protected group, just as an employer might

23

Applying section 533 in our scenario also would not comport with section 533's purpose "to prevent insurance coverage from encouragement of wilful tort." (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648.) This purpose is evident in situations like that of *B & E Convalescent Center*, in which an employer should not be able to shield itself from the costs of liability for intentional conduct it knows, or with minimal investigation should know violates well-established principles of public policy. If applied universally to all retaliation claims, even those against employers acting mistakenly but in good faith, section 533 becomes a shackle, preventing employers from dealing with insubordinate employees for fear of having to face a retaliation claim without the protection of liability insurance. This does not serve the purposes of section 533.

### 4. The *Rivera* complaint alleged nonwillful bases for liability

The *Rivera* complaint asserted a single cause of action under Labor Code section 1102.5, without express reference to any particular subdivision of that statute. The complaint alleged, however, retaliation for the *Rivera* plaintiffs' refusal to participate in a purportedly unlawful quota system, thus alleging liability under Labor Code section 1102.5, subdivision (c).

---

intentionally violate Labor Code section 1102.5 by punishing an employee for refusing to participate in activity the employer knows is illegal. Our point is that neither tort necessarily requires proof of an intent to violate the employee's rights, and therefore, an employer acting without intent to harm could still be liable.

At paragraph 25, the complaint averred the police department "imposed an unlawful citation and arrest quota in violation of California Vehicle Code sections 41600 *et seq.* on its officers, and illegally compared officers using shift averaging as a means of determining a benchmark for performance. [The department] thereafter retaliated against those [who] *refused to participate in* and/or reported the unlawful citation and arrest quota." (Italics added.) At paragraph 27, the complaint alleged, "*For refusing to meet the unlawful quota*, and for speaking out against it, Plaintiffs were retaliated against," including "negative language and/or documentation being placed in their personnel packages about *their refusal to comply with the unlawful quota.*" (Italics added.) At paragraph 36, "Defendants . . . retaliated against Plaintiff[s] for disclosing information to the City of Whittier and the Whittier Police Department and/or *refusing to engage in the illegal activity* . . . . Plaintiffs disclosed that they were required to illegally fulfill a traffic citation quota and were illegally compared to other officers using shift averaging as a means of determining a benchmark for performance . . . . Alternatively or during the same time, Plaintiffs *refused to participate in* fulfilling traffic citation quotas in violation of [Vehicle Code sections 41600 et seq.]" (Italics added.) At paragraph 38, "A motivating factor for the Defendants to engage in the foregoing adverse employment actions against Plaintiffs was to retaliate for the Plaintiffs' *refusal to engage in illegal activity* and their engaging in the protected activities of disclosing information to the City of Whittier and the Whittier Police Department . . . ." (Italics added.)

Under these allegations, the City could be found liable if (1) a court found the City policy at issue violated a statute,

25

regulation, or rule and (2) the City subjected the *Rivera* plaintiffs to adverse employment actions because of their refusal to comply with that policy. The *Rivera* plaintiffs would *not* have to prove the City knew or should have known the City policy was illegal, or acted maliciously, punitively, or in bad faith, nor could the City avoid liability by establishing it reasonably believed the alleged policy was legal.

We cannot conclude based on the allegations in the *Rivera* complaint that the City policy with which the *Rivera* plaintiffs refused to comply was clearly illegal such that the City reasonably could not have believed otherwise. Vehicle Code section 41602 prohibits a police department from "establish[ing] any policy requiring any peace officer or parking enforcement employees to meet an arrest quota." An arrest quota is "any requirement regarding the number of arrests made, or the number of citations issued, by a peace officer, or parking enforcement employee, or the proportion of those arrests made and citations issued by a peace officer or parking enforcement employee, relative to the arrests made and citations issued by another peace officer or parking enforcement employee, or group of officers or employees." (Veh. Code, § 41600.) An officer's "number of arrests or citations issued," however, "may . . . be considered in evaluating the overall performance of a peace officer" if it is not "the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by" the department. (*Id.*, § 41603.)[10]

_____

[10] Vehicle Code section 41603 provides, in its entirety, "No state or local agency employing peace officers or parking enforcement employees engaged in the enforcement of this code

The interplay between Vehicle Code sections 41602 and 41603 creates a potential for ambiguity as to whether "shift averaging" and setting performance benchmarks by comparing officers' arrest counts, as alleged in the *Rivera* complaint, is unlawful. Again, under Vehicle Code section 41603, a police department properly can consider an officer's arrest count when evaluating performance, including by comparing it to other officers' arrest counts, so long as there is no requirement the officer achieve a certain number of arrests (which arguably would be a quota), and so long as the department considers other criteria in addition to arrest count. Conceivably, therefore, a department reasonably could believe it could impose an arrest count benchmark based on shift averages if that benchmark was but one of several factors considered in evaluating performance.

A court, however, might disagree. Consistent with our conclusion in the previous section of the Discussion, the police department in that circumstance would be liable under Labor Code section 1102.5, subdivision (c), but would not have acted willfully. As the City argues, a "belief that Vehicle Code section 41603 specifically allowed the number of arrests to be considered in evaluating the overall performance of a peace

shall use the number of arrests or citations issued by a peace officer or parking enforcement employees as the sole criterion for promotion, demotion, dismissal, or the earning of any benefit provided by the agency. Those arrests or citations, and their ultimate dispositions, may only be considered in evaluating the overall performance of a peace officer or parking enforcement employees. An evaluation may include, but shall not be limited to, criteria such as attendance, punctuality, work safety, complaints by civilians, commendations, demeanor, formal training, and professional judgment."

27

officer . . . necessarily means that there was no 'specific intent to wrongfully inflict injury.' " The *Rivera* complaint's allegations do not preclude this scenario, and therefore allege a theory under which the *Rivera* plaintiffs could prevail without proof of willful conduct. Section 533 thus does not bar indemnifying the City for settlement of such a claim.

Because the *Rivera* complaint alleged liability under subdivision (c) of Labor Code section 1102.5, we need not decide whether violations of other subdivisions of that statute are necessarily willful under section 533, and express no opinion on that question.

## B. Starr's Policy Language Providing Coverage for "Damages" Does Not Require It To Indemnify the *Rivera* Settlement

Starr argues its policy language does not require it to indemnify the City for the *Rivera* settlement, because the policies provide coverage only for "damages," and a settlement is not "damages." Starr raised this argument below, but the trial court did not reach it, ruling instead in Starr's favor under section 533. We now reach that alternative argument and agree with Starr.

### 1. Relevant case law

In *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, commonly referred to as *Powerine* after the real party in interest, our Supreme Court interpreted a provision in the standard comprehensive general liability insurance policy requiring indemnity for " 'sums that the insured becomes legally obligated to pay as damages.' " (*Id.* at p. 951.) The court concluded that provision limited the insurer's duty to indemnify to "money ordered by a court." (*Ibid.*) Accordingly, the

28

insurer did not have to indemnify the insured for "expenses required by an administrative agency pursuant to an environmental statute," in that case costs imposed by environmental agencies for clean-up and abatement of contaminated sites.  (*Id.* at pp. 951–952, 954.)

*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406 (*County of San Diego*) involved an insured seeking indemnification "for expenses incurred . . . in responding to an administrative agency order requiring it to remediate environmental contamination," as well as "sums expended . . . to settle related third party property damage claims outside the context of a lawsuit."  (*Id.* at p. 410.)  The policy at issue was not a standard comprehensive policy, as in *Powerine*, but a nonstandard excess third party liability policy.  (*Ibid.*)  The policy language, as characterized by the court, required the insurer to indemnify " 'for all sums which the insured is obligated to pay by reason of liability imposed by law or assumed under contract or agreement,' arising from 'damages' caused by personal injuries or the destruction or loss of use of tangible property."  (*Id.* at p. 411.)

Our high court held *Powerine* controlled even as to this nonstandard policy, and thus indemnity of " 'damages' " was limited to " 'money ordered by a court.' "  (*County of San Diego*, *supra*, 37 Cal.4th at pp. 410–411.)  Quoting *Powerine*, the court explained, " '[T]he duty to indemnify "entails the payment of money" [citations],' 'has as its purpose "to resolve liability . . . *after* liability is established" [citations],' and 'can arise only after damages are fixed in their amount [citations].'  [Citation.]"  (*Id.* at p. 417.)  The term " 'damages,' " "both in its legal and commonly understood or ' "ordinary and popular sense," ' is limited to 'money ordered by a court.' "  (*Ibid.*)  " '[O]ne

29

would *not* speak of any "sum that the insured becomes legally obligated to pay *as damages*" *apart from any order by a court. . . .* That is because, as a sum that the insured becomes legally obligated to pay, "damages" presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively. [Citations.]  "Damages" do not constitute a redundancy to a "sum that the insured becomes legally obligated to pay," but a limitation thereof.'  [Citation.]"  (*Ibid.*)

Accordingly, because the policy required indemnification only of "damages," "costs and expenses associated with responding to administrative orders to clean up and abate soil or groundwater contamination *outside the context of a government-initiated lawsuit seeking such remedial relief*, and property buyout settlements negotiated with third party claimants outside the context of a court suit, do not fall within the literal and unambiguous coverage terms of the . . . insuring agreement." (*County of San Diego*, *supra*, 37 Cal.4th at p. 421.)

In *Powerine* and *County of San Diego*, the insureds were seeking indemnification of expenditures and settlements outside the context of a lawsuit.  In *Aerojet-General Corp. v. Commercial Union Ins. Co.* (2007) 155 Cal.App.4th 132 (*Aerojet-General*), the Third District Court of Appeal applied those holdings to settlements *within* the context of a lawsuit.  (*Id.* at p. 143.)

*Aerojet-General* concerned insurers' duty to indemnify settlements reached in lawsuits brought by various " 'water entities' " to recover "costs arising out of the alleged contamination of groundwater in the San Gabriel Valley.' " (*Aerojet-General*, *supra*, 155 Cal.App.4th at p. 136.)  The policies at issue required the insurers to indemnify " 'all sums which the [insured] shall become legally obligated to pay, or by final

30

judgment be adjudged to pay, to any person or persons as damages . . . .' " (*Id.* at p. 137.)

The Court of Appeal concluded that the limitation of indemnity to " 'damages' " excluded settlements. (*Aerojet-General*, *supra*, 155 Cal.App.4th at pp. 143–144.) The court explained, "There can be no dispute that the term 'damages' as interpreted in [*Powerine*] and used in liability insurance indemnity provisions means only money ordered by a court to be paid. The term has a clear and literal meaning, and, having been construed consistently by the Supreme Court as money ordered by a court to be paid, the term cannot be held to be ambiguous." (*Id.* at p. 143, citing *County of San Diego*, *supra*, 37 Cal.4th at p. 423.) Because a court did not order Aerojet to pay damages, nor did the parties seek "for the terms of the agreement to be entered as the judgments in the lawsuits," "[n]othing in the record indicates the court ordered Aerojet to pay any sum of money. Accordingly, the settlement costs are outside the scope of indemnity coverage in [the insurers'] policies." (*Aerojet-General*, at p. 144.)

The court rejected the argument that "the phrase 'money ordered by a court' refers generally to any monies paid to resolve a lawsuit as distinguished from monies paid in response to an administrative order." (*Aerojet-General*, *supra*, 155 Cal.App.4th at p. 144.) "The clause means what it says: money *ordered* by a court." (*Ibid.*) The court also rejected the argument that its holding "defeats the public policy favoring settlements." (*Id.* at p. 145.) "If contractual language in an insurance contract is clear and unambiguous, it governs, and we do not rewrite it 'for any purpose.' " (*Ibid.*, quoting *Powerine*, *supra*, 24 Cal.4th at pp. 967, 968.)

31

### 2. Analysis

Starr's policy states, "We will pay on your behalf sums in excess of the retained limit that the insured becomes legally obligated to pay for damages to compensate others for loss arising out of your employment practice liability wrongful act . . . ." This language is materially identical to that of the policies in *Powerine* and *Aerojet-General*, in which the courts held the term "damages" to be limited to money ordered by the court. As in *Aerojet-General*, the record here does not indicate the trial court ordered the City to pay any money to the *Rivera* plaintiffs, nor were the terms of the settlement entered as a judgment. Under the reasoning and holding of *Aerojet-General*, Starr was not required to indemnify the City for the *Rivera* settlement.

The City does not address Starr's alternative argument either in its opening brief or reply, and therefore provides no basis for us to deviate from *Aerojet-General*'s holding. We agree with Starr that *Aerojet-General* controls and Starr has no duty to indemnify the City for the *Rivera* settlement.

Unlike Starr's policy, Everest's policy language describing the scope of coverage does not use the term "damages," the key term in *Powerine*, *County of San Diego*, and *Aerojet-General*. Instead, it states Everest will pay "the 'ultimate net loss' . . . that the insured becomes legally obligated to compensate others . . . ." " 'Ultimate net loss,' " in turn, is defined as "the total sum . . . actually paid or payable due to a 'claim' or 'suit' for which you are liable either by a settlement to which we agreed or a final judgment, and shall include defense costs." Everest does not assert this policy language on appeal to argue it defeats the City's indemnification claim for the *Rivera* settlement. We thus express

no opinion on that issue and nothing herein is intended to foreshadow how we would rule on it.

## DISPOSITION

The judgment in favor of Starr Indemnity & Liability Company is affirmed.  The judgment in favor of Everest National Insurance Company is reversed and the matter remanded for further proceedings.  The City of Whittier shall pay Starr's costs on appeal, and Everest shall pay Whittier's costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

BENDIX, Acting P. J.

I concur:

WEINGART, J.

33

CHANEY, J., Concurring and Dissenting.

I agree with the majority's holding with respect to Starr.

With respect to Everest, the majority ably marshals the case law concerning application of Insurance Code section 533 (section 533) to Labor Code retaliation claims and concludes that some claims under Labor Code section 1102.5 may not involve willful conduct within the meaning section 533. The possibility that section 533 may not bar insurance for the *Rivera* plaintiffs' claims precludes summary judgment on this issue. (Maj. opn. *ante*, at p. 28.) I agree with this holding as well.

However, rather than reverse the judgment as to Everest and remand the matter I would invite supplemental briefing on a potentially dispositive issue of law: Whether the Everest policies themselves precluded coverage.

The Everest policies provided coverage for sums that the City of Whittier became "legally obligated" to pay third parties. But here, the City never became legally obligated to pay the *Rivera* plaintiffs anything, it voluntarily (and over Everest's objection) paid a settlement. The policy language read as a whole does not extend the indemnification obligation to the unapproved settlement of claims. On the contrary, the policies provided that only approved settlements would be covered. Because the City was not legally obligated to settle the underlying lawsuit, the Everest policies afforded no coverage for the settlement.

We may affirm a grant of summary judgment on any ground supported by the record (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140) if it is a " 'ground that the parties had an adequate opportunity to address in the trial court' " (*Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634, 639). The majority observes in the unpublished portion of the

opinion that Everest does not assert on appeal that policy language itself defeats the City's indemnification claim for the Rivera settlement, thus giving the City no opportunity to rebut such an argument.  In that circumstance, I believe the economical course is not to reverse the Everest judgment but to request supplemental briefing on this issue pursuant to Government Code section 68081 (before rendering a decision based upon an unbriefed issue the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing).

Pursuant to the above reasoning, I would affirm the judgment as to Starr and invite supplemental briefing as to Everest.


CHANEY, J.

2